**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CANDICE S. LOGAN**, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 07-1472** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | **Judge Nora Barry Fischer** |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY**, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Plaintiff, Candice S. Logan ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383. This matter comes before the Court on cross-motions for summary judgment, and the supporting briefs of both parties, filed pursuant to Federal Rule of Civil Procedure 56. The record has been developed at the administrative level. For the following reasons, the Commissioner of Social Security's motion for summary judgment is granted, and the decision of the Administrative Law Judge is affirmed.

### II.    PROCEDURAL HISTORY

On November 14, 2005, Plaintiff filed her application for SSI, alleging that she suffered from a learning disability that began on November 29, 1984, which is the date of her birth. (Docket No. 6 at 16, R. at 16); (hereinafter "R. at ___ ").  Plaintiff's claim for benefits was disapproved on March

23, 2006. (R. at 16). She requested a hearing before an Administrative Law Judge ("ALJ") on May 8, 2006. (R. at 16). A hearing was held on July 13, 2007, in Pittsburgh, Pennsylvania. (R. at 16). At the hearing, Plaintiff, who was represented by counsel, appeared and testified. (R. at 16). On the date of the hearing, Plaintiff was 22 years of age and had completed 12 years of high school in special education curriculum. (R. at 16). Karen S. Krull, an impartial vocational expert also testified. (R. at 16).

By decision dated August 2, 2007, the ALJ denied Plaintiff's claim for SSI benefits, concluding that Plaintiff had not been under a "disability" within the meaning of the Social Security Act. (R. at 16-25). Plaintiff requested a review of the ALJ's decision by the Appeals Council. (R. at 9-12, 227). Plaintiff's request for review was denied on August 31, 2007, thereby making the ALJ's decision the final decision of the Commissioner in this case. (R. at 5-7). Plaintiff thereafter filed the present action on October 29, 2007, seeking judicial review of the Commissioner's decision. Plaintiff filed a motion for summary judgment on March 11, 2008. (Docket No. 8). Likewise, the Commissioner filed a motion for summary judgment on April 9, 2008. (Docket No.10).

## III.    STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala,* 40 F.3d 43, 45 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 108 S.Ct. 2541, 2545 (1988). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart,* 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents [her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health and Human Services,* 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. § 423(d)(1). A claimant is considered to be unable to engage in substantial gainful activity "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the economy." 42 U.S.C. § 423(d)(2)(A).

An ALJ must do more than simply state factual conclusions to support his ultimate findings. *Baerga v. Richardson,* 500 F.2d 309, 312-313 (3d Cir. 1974). The ALJ must make specific findings of fact. *Stewart v. Secretary of HEW,* 714 F.2d 287, 290 (3d Cir. 1983). The ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority under 42 U.S.C. § 405(a), has promulgated a five-step sequential evaluation process for the purpose

of determining whether a claimant is "disabled" within the meaning of the Act. The United States

Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [20 C.F.R.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas,* 540 U.S. 20, 24-25 (2003)(footnotes omitted).

If it is shown that the claimant is unable to resume previous employment, the burden shifts

to the Commissioner (Step 5) to provide that, given claimant's mental or physical limitations, age,

education, and work experience, she is able to perform substantial gainful activity in jobs available

in the national economy. *Campbell,* 461 U.S. at 461; *Stunkard*, 842 F.2d at 59; *Kangas,* 823 F.2d

at 777; *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986).

## IV.    FACTS

### A.    General Background

Plaintiff was born on November 29, 1984. (R. at 85). Plaintiff was twenty-one (21) years old

on the date she filed her application for SSI benefits, and was twenty-two (22) at the time of her hearing before the ALJ. (R. at 25). For decisional purposes, Plaintiff was considered a "younger individual" under 20 C.F.R. § 416.963. (R. at 18). Plaintiff completed twelve years of education, and participated in some special education services. (R. at 131). She graduated from high school on June 12, 2003, and was ranked 238 out of 461 graduating seniors with a grade point average of 2.56. (R. at 130). In 2005, Plaintiff earned her certification as a beautician from Empire Beauty School. (R. at 103, 172). Plaintiff has a son; she is single and has never married. (R. at 172, 226). Plaintiff briefly held a few different jobs in the past including employment as a babysitter, cashier at a retail chain store, and beauty assistant/receptionist at a hair salon. (R. at 86, 100, 242). Plaintiff had previously filed an application for disability insurance benefits ("DIB") under Title II in December 2003, and had also filed previous SSI applications in November 2005, November 2003, August 1998, January 1998, and January 1993. (R. at 72-73). The SSA denied each of these applications at the initial level of review. (R. at 72-73). Plaintiff claims that she is disabled due to a learning disability and claims that the onset of her disability is November 29, 1984. (R. at 99-100).

**B.    Medical Background**

Plaintiff has alleged two mental impairments: (1) a learning disability and (2) depression. (R. at 99, 241). Plaintiff attended Penn Hills School District where she participated in special education classes under an individualized educational program. (R. at 133). The percentage of time that Plaintiff received special education outside of the regular education classroom was less than 21% under her individualized educational plan. (R. at 141). Plaintiff's primary care physician, Charles M. Hefflin, M.D. provided Plaintiff's prior mental records from March 27, 2001, through March 19, 2003; the records do not appear to reveal any complaints of depression. (R. at 152-157). Plaintiff

underwent a clinical psychology evaluation on January 26, 2006, by Dr. Stephen Perconte, Ph.D. (R. at 172-79). Dr. Perconte noted that, despite numerous attempts to elicit complaints or difficulties, Plaintiff reported to him no problems and denied depression. (R. at 174). Dr. Perconte stated that Plaintiff was generally alert, cooperative, and pleasant. (R. at 175). He noted that Plaintiff indicated that, in regards to suicidal ideation, "[she] thought about it when [she] was younger and depressed," but expressed that this is different from how she currently feels. (R. at 175). Dr. Perconte stated that Plaintiff reported no problems with activities of daily living and is able to perform such activities without assistance. (R. at 175). Dr. Perconte administered a Mini-Mental State Exam to Plaintiff; she obtained a score of 28 out of 30, and Dr. Perconte indicated that her scores were generally within the average range for Plaintiff's age and education level. (R. at 175). Dr. Perconte concluded that Plaintiff reported no symptoms consistent with an Axis I psychiatric diagnosis, depression, or anxiety. (R. at 176). Overall, Dr. Perconte stated that he considered Plaintiff's prognosis to be fair. (R. at 178). He noted that, aside from what appeared to him to be below-average intellectual functioning, Plaintiff appeared to be functioning within normal limits, in regard to psychopathology. (R. at 178).

On February 25, 2006, Plaintiff met with Dr. Perconte for a second clinical psychology evaluation, during which Dr. Perconte administered the Wechsler Adult Intelligence Scale - III. (R. at 185). Dr. Perconte reported the results of the psychological testing as follows: full scale IQ score of 69, verbal IQ score of 75, and performance IQ score of 67. (R. at 186). Dr. Perconte indicated that Plaintiff's scores were in the range of the upper level of mild mental retardation or lower level of borderline intellectual functioning. (R. at 186). Dr. Perconte indicated that Plaintiff's overall level of functioning was between the level of mild mental retardation and borderline intellectual functioning. (R. at 187). Dr. Perconte diagnosed Plaintiff with an Axis II disorder of mild mental retardation. (R.

at 188).

On March 16, 2006, Dr. Ray Milke, Ph.D. reviewed the medical evidence of record and completed an assessment of Plaintiff's mental limitations (R. at 193-207). Dr. Milke considered Plaintiff's mental condition in light of Listing 12.05. (R. at 193). He concluded that Plaintiff suffered from mild mental retardation, but indicated that Plaintiff's mental impairment did not precisely satisfy any of the diagnostic criteria for the listing. (R. at 197).

Plaintiff was also under the care of Allegheny East Mental Health Center ("Allegheny East") beginning in June of 2007, and was evaluated by non-licensed clinician, Nancy Hamilton. (R. at 211). Hamilton noted that at Plaintiff's initial informal interview on April 26, 2007, Plaintiff had reported depressive symptoms and stress attributable to being a single parent, and seeking employment and support. (R. at 215). Hamilton stated in her initial assessment report, dated June 12, 2007, that Plaintiff had indicated that her present concerns were addressing depression and anger, obtaining support as a single parent, and working to get her driver's permit. (R. at 215). Hamilton diagnosed Plaintiff with the Axis I clinical disorder of depressive disorder/not otherwise specified. (R. at 220). Hamilton noted that Plaintiff reported that she had made past attempts to take a knife to herself and had thoughts of overdosing and killing herself, however Plaintiff stated she had no present suicidal ideations. (R. at 222). Hamilton recommended weekly individual therapy for Plaintiff and noted that Plaintiff was not presently under psychiatric care and was taking no medications. (R. at 226).

### C. Administrative Hearing

A hearing was held on July 13, 2007, in Pittsburgh, Pennsylvania, before Lamar Davis, Administrative Law Judge. At the hearing, Plaintiff appeared with the assistance of counsel, Karl Osterhaut, Esquire. (R. at 230). Plaintiff testified about her prior work experience as an assistant at

a beauty salon. (R. at 232-36, 243). Plaintiff indicated that her supervisor had to repeat instructions to her on a number of occasions. (R. at 243). Plaintiff also discussed the therapy sessions that she underwent at Allegheny East with Nancy Hamilton (R. at 243). Plaintiff indicated that she had thoughts of an overdose in the past and stated that when she becomes stressed out that she tends to become depressed, though not on a daily basis. (R. at 244-45). Vocational expert, Karen Krull, also testified. (R. at 247-50). The ALJ asked Krull whether, assuming a hypothetical individual of the same age, educational background, and vocational history as Plaintiff, whether any vocational opportunities existed. (R. at 248). Krull answered that several jobs existed in the economy including janitor, dietary aide, and dishwasher. (R. at 249). The ALJ modified his question and asked Krull whether competitive work would exist for the same hypothetical individual if that individual required supervision for redirection and monitoring every two hours throughout the course of an eight-hour workday to prevent mistakes and imprecision. (R. at 249). Krull answered that such a limitation would not be consistent with competitive work and would abolish the job base for such an individual. (R. at 249).

## V. ADMINISTRATIVE LAW JUDGE'S OPINION

The ALJ concluded that Plaintiff's medically determinable impairments do not meet the requirement for receipt of SSI benefits and that Plaintiff retained the ability to perform work that exists in significant numbers in the national economy. (R. at 26). The ALJ acknowledged that Krull had testified that Plaintiff could not do a job in the competitive economy if she needed to be redirected every two hours by a supervisor. (R. at 26). However, noting that Plaintiff tends to persevere at tasks and is not easily distracted, the ALJ found insufficient medical evidence to show that Plaintiff would need to be redirected every two hours. (R. at 26). Accordingly, the ALJ found

that Plaintiff has not been under a disability, as defined in the Social Security Act, since November 14, 2005, the date Plaintiff's application for SSI was filed. (R. at 26).

The ALJ issued his opinion on August 2, 2007. In his application of the five step sequential evaluation process pursuant to 20 C.F.R. § 416.920(a), the ALJ made the following determinations: At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since November 14, 2005, the date she applied for SSI benefits. (R. at 18).

At step two, the ALJ found that Plaintiff was afflicted with the "severe" impairment of borderline intellectual functioning. (R. at 18). He noted that IQ testing of Plaintiff which resulted in a verbal IQ score of 75, performance IQ score of 67, and full-scale IQ score of 69 tended to indicate mild mental retardation. (R. at 18). However, the ALJ concluded that Plaintiff was not mentally retarded based upon observations of the examiner which conflicted with a finding that Plaintiff was mentally retarded, as would be suggested on the basis of her IQ scores alone. (R. at 18). The observations noted by the examiner indicated that Plaintiff was able to read, spell, and do arithmetic at the sixth or seventh grade level, she had adequate mental capacity to do simple repetitive work, and she had a good attention span and average motivation. (R. at 18). Thus, the ALJ concluded that Plaintiff suffered, not from mild mental retardation, but rather, borderline intellectual functioning. (R. at 18).

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the regulations. (R. at 18-21). The listing relevant to Plaintiff's claim for SSI benefits is found in § 12.05. Because in step two, the ALJ concluded that Plaintiff was not mentally retarded, he determined the introductory phrase of Listing 12.05 for mental retardation was

not satisfied.[1]   Nevertheless, for the sake of argument, the ALJ considered Plaintiff's mental impairment under the remaining requirements of Listing 12.05 and explicated why, even if he had considered the Plaintiff to be mildly mentally retarded, the Listing would still not be satisfied. (R. at 19).

The ALJ explained that under the Act, the required severity level of mental retardation necessary to establish the existence of a "disability" is met when the requirements in paragraphs A, B, C, or D of Listing 12.05 are satisfied.  (R. at 19).  The ALJ concluded that Plaintiff could not satisfy the severity levels set forth in paragraphs A, B, or D.[2]  (R. at 19-20).  With respect to paragraph C, the ALJ found that its requirements were not met because the Plaintiff was not afflicted with an additional physical or other mental impairment imposing significant work-related limitations of function.  (R. at 19-20). The ALJ stated that even if the Plaintiff's IQ scores were valid and in the 60-70 range, (an assumption which he made explicitly only for the sake of argument), Plaintiff's alleged

---

[1]

Before applying Listing 12.05, the ALJ first elaborated on why at step 2 he concluded that Plaintiff was not mentally retarded. The ALJ pointed to the facts that when Plaintiff attended school she was in regular classes 80% of the time on the basis of a "specific learning disability," and that according to Plaintiff's Individualized Education Program (IEP) at Penn Hills School District, she was not considered mentally retarded. He noted that Plaintiff could read at the seventh grade level, spell at the sixth grade level, and do arithmetic at the sixth grade level.  The ALJ highlighted the fact that Plaintiff graduated at the middle of her class, ranking 238 out of 461, noting that mental retardation generally denotes intellectual functioning in the lowest two percent of the population and finding it unlikely that a person whose intellectual capacity lags behind 98 percent of peers her age would achieve grades higher than those earned by 45 percent of her classmates. Finally, the ALJ determined that although record indicated that Plaintiff needed some learning support during secondary school, it did not show that she had "deficits in adaptive functioning" that are indicative of retardation. (R. at 18-19).

[2]

Because these finding are not at issue, further discussion of the ALJ's determinations in regard to paragraphs A, B, and D is unnecessary.

depressive disorder did not satisfy the "second impairment" requirement of 12.05C because there was no evidence that Plaintiff's depressive symptoms would cause her more than minimal interference with her ability to work. (R. at 19-20).

Proceeding to step four, the ALJ concluded that Plaintiff had the following functional capacity:

> [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform only simple, routine, repetitive tasks. She should not be called upon to exercise independent judgment. She should not be exposed to significant changes in the work setting. She cannot perform at a piece-work production rate pace. She should not be required to engage in direct public contact.

(R. at 21). The ALJ also determined that although Plaintiff had previously held a few jobs, she had never worked long enough or earned enough at her jobs for the work to constitute "substantial gainful activity." Thus, under 20 C.F.R. § 416.965, Plaintiff had no "past relevant work" of which to return. (R. at 23). Because Plaintiff had no past relevant work, transferability of job skills was not an issue. (R. at 23).

At step 5, the ALJ considered Plaintiff's age, education, work experience, and residual functional capacity, along with the vocational expert's testimony, and concluded that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 23). The ALJ also noted that Plaintiff had at least a high school education and is able to communicate in English. (R. at 23). Based on the foregoing conclusions, the ALJ found that Plaintiff was not "disabled" under Section 1614(a)(3)(A) of the Social Security Act. (R. at 24).

## VI.    ISSUES BEFORE THIS COURT

Plaintiff argues that the ALJ erred in his assessment of Plaintiff's mental impairment under the listing contained in § 12.05C. Specifically, Plaintiff contends that at step three, the ALJ should have found that Plaintiff had a valid IQ score between 60 to 70, along with the additional severe impairment of depression, and accordingly concluded that Plaintiff met Listing 12.05C qualifying as "disabled" within the meaning of the Act. (Docket No. 9 at 6-21). In response, the Commissioner counters that substantial evidence supports the ALJ's finding that Plaintiff's mental impairment did not meet Listing 12.05C because the ALJ had concluded that Plaintiff had borderline intellectual functioning, not mental retardation. (Docket No. 11 at 7-10). The Commissioner asserts that under § 12.05C, a claimant's impairment must satisfy three requirements: (1) the capsule definition of mental retardation contained in the introduction of § 12.05, *i.e.*, "deficits in adaptive functioning;" (2) a valid IQ score between 60 and 70; and (3) an additional impairment that imposes significant work-related limitations. (Docket No. 11 at 7). The Commissioner further contends that even if the ALJ had found that Plaintiff suffered from mental retardation and had a valid IQ score between 60 and 70, substantial evidence supports the ALJ's conclusion that Plaintiff did not have an additional impairment causing significant work-related limitations, and thus the third criteria of Listing 12.05C was not met. (Docket No. 11 at 11-13). In response to said argument, Plaintiff contends that neither a diagnosis of mental retardation nor evidence indicating "deficits in adaptive functioning" are necessary to meet Listing 12.05C. (Docket No. 12 at 2-10). Further, Plaintiff asserts that the capsule definition contained in the introduction of § 12.05 does not impose upon claimants an additional requirement; rather Plaintiff contends that "deficits in adaptive functioning" only define what the SSA means by "mental retardation" for the purpose of Listing 12.05. (Docket No. 12 at 7-10). Thus, Plaintiff argues that to satisfy § 12.05C and prove that she is "disabled" she only needed to provide

evidence of a valid IQ score of 70 or less and establish the existence of an additional severe impairment. (Docket No. 12 at 10). Plaintiff asserts that she has provided such evidence, and hence, asks this Court to reverse the decision of the Commissioner. *Id*.

## VII.    DISCUSSION

The guidelines for assessing mental disorders under the Act are contained in § 12.00 of 20 CFR Part 404, Subpart P, Appendix 1. The listings for mental disorders are arranged in nine diagnostic categories. Applicable here, the listing for the diagnostic category of mental retardation is set forth in § 12.05, which provides as follows:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidence by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
   Or
B. A valid verbal, performance, or full scale IQ of 59 or less;
   Or
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of functioning;
   Or
D. A valid verbal, performance or full scale IQ of 60 through 70, resulting in at least two of the following:
   1. Marked restrictions of activities of daily living; or
   2. Marked difficulties in maintaining social functioning; or
   3. Marked difficulties in maintaining concentration, persistence, or pace; or
   4. Repeated episodes of decompensation, each of extended duration.

20 CFR Part 404, Subpart P, Appendix 1, § 12.05.

The Court will first address the central legal dispute between the parties of whether the capsule definition of mental retardation set forth in § 12.05 is a requirement of a claimant attempting to prove the existence of a disability under Listing 12.05C. Plaintiff asserts that the capsule definition does not impose an additional burden on claimants. (Docket No. 12 at 7-8). To the contrary, the Commissioner takes the position that the capsule definition, *i.e.*, "deficits in adaptive functioning" is a threshold requirement of Listing 12.05C. (Docket No. 11 at 7).

In this Court's estimation, the law is clear that any claimant seeking to establish that she suffers from a disability under Listing 12.05C must satisfy the capsule definition of § 12.05, along with the other two criteria set forth in paragraph C, *i.e.,* a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of functioning. In September of 2000, the SSA amended the introductory material to § 12.00 which discusses the structures of the various mental disorder listings. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 Regarding Listing 12.05, the SSA stated that "[i]f [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph [of §12.05] *and* any one of the four sets of criteria [A, B, C, or D], we will find that [the claimant's] impairment meets the listing." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(A) (emphasis added). In 2003, the SSA published an acquiescence ruling in which the agency stated that, even pre-September 2000, the SSA always interpreted Listing 12.05 to mean that a claimant's impairments meets the listing if that claimant has:

> (1) mental retardation, i.e., significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period, or autism, i.e., a pervasive developmental disorder characterized by social and significant communication deficits originating in the developmental

period; (2) a valid verbal, performance or full scale IQ in the range specified by Listing 12.05C; and (3) a physical or other mental impairment that is severe within the meaning of 20 CFR 404.1520(c) or 416.920(c).

Soc. Sec. Acquiescence Rul. 03-1(7), 68 Fed. Reg. 74, 279, 74, 280 (Dec. 23, 2003). The United States Court of Appeals for the Third Circuit agrees with the SSA's interpretation of Listing 12.05. *See Vivaritas v. Comm'r of Social Sec.*, 264 Fed.Appx. 155, 160 (3d Cir. 2008) (not selected for publication) (holding that to meet the requirements of Listing 12.05C a claimant must show mental retardation that was initially manifested during the developmental period); *Cortes v. Comm'r of Social Sec.*, 255 Fed.Appx. 646, 651 (3d Cir. 2007) (not selected for publication) (holding that under the § 12.05, a claimant must first prove subaverage general intellectual functioning with deficits in adaptive functioning); *See e.g., Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003); *Elder v. Comm'r,* Civ. Action No. 07-59, 2008 WL 2993501 at *5 (W.D. Pa. Jul. 31, 2008); *Smith v. Barnhart*, Civ. Action No. 05-531, 2006 WL 1450609 at *1 (E.D. Pa. May 23, 2006). Thus, Plaintiff's argument that the capsule definition does not state an additional requirement placed on claimants, but rather only defines what the SSA means by "mental retardation" for the purpose of Listing 12.05 fails.

Having determined that the capsule definition contained in § 12.05 imposes an additional requirement on claimants seeking to prove disability under that listing, the Court must now determine whether the ALJ's determination that Plaintiff did not suffer from mental retardation is supported by substantial evidence. Although the SSA's 2000 revision of § 12.00 clarified the issue of whether a claimant had to prove that she suffered from "mental retardation" as exhibited by "deficits in adaptive functioning," the revised regulation provides neither a definition of "deficits in adaptive functioning"

nor standards or guidelines by which to assess and measure the existence or severity of a claimant's alleged "deficits." Although there is no Third Circuit case that addresses this issue, a Social Security regulation and cases outside the circuit provide guidance to the Court.

In April of 2002, the SSA published a regulation entitled *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 FR 20018 (April 24, 2002). The comments to the regulation explain why the definition of mental retardation contained in the capsule definition of § 12.05 was drafted rather than adopting the definition found in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV),[3] a handbook for mental health professionals, published by the American Psychiatric Association. 67 FR at 20022. The SSA explained that in developing its definition of mental retardation, *i.e.*, "deficits in adaptive functioning," the SSA considered the different definitions of the four major professional organizations in the United States that work with mental retardation, which include both the American Psychiatric Association ("APA"), as well as the American Association on Mental Retardation ("AAMR"). The various definitions from the four organizations all have in common the requirement of "deficits in intellectual functioning," however, the organizations differ as to the age of onset and the method of measuring the required deficits in adaptive functioning. The SSA clarified that, although the agency has set the age of onset at twenty-two (22) for the purposes of the Social Security Act, "it does not seek to endorse the methodology of one professional organization over another. . .[and] allow[s] use of any of the measurement methods

---

[3]

The DSM-IV, published by the APA provides the following standard for measuring deficits in adaptive functioning: "significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) (4th ed., American Psychiatric Association, 1994, at 39).

recognized and endorsed by [one of] the [four major] professional organizations" that work with

mental retardation. *Id.* Thus, in order to properly assess a claimant's alleged mental retardation to

determine if deficits in adaptive functioning exist, according to the SSA, an ALJ should consult either

the APA's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), the standard set forth

by the AAMR,[4] or the criteria of the other major mental health organizations.

Although the Third Circuit has not previously had the opportunity to determine whether an

ALJ properly assessed a claimant's alleged mental retardation disability in accordance with the SSA's

directive set forth in its *Technical Revisions to Medical Criteria for Determinations of Disability,*

such an opportunity was afforded to the Tenth Circuit in the case of *Barnes v. Barnhart*, 116 Fed.

Appx. 934, 939, 2004 WL 2681465 (10th Cir. 2004) (not selected for publication). In *Barnes*, the ALJ

considered the claimant's daily activities, social skills, and educational history, and concluded that

her impairment did not cause her to show sufficient "deficits in adaptive functioning." *Barnes*, 116

Fed. Appx at 940.  The court in *Barnes* cited the SSA's *Technical Revisions to Medical Criteria for

Determinations of Disability* and ultimately remanded the case to the ALJ with instructions to the ALJ

to comply with the SSA's directive by identifying and applying one of the four standards of

---

[4]

The AAMR, now the American Association on Intellectual and Developmental Disabilities
(AAIDD), provides the following standard: significant limitations in intellectual functioning and in
adaptive behavior as expressed in conceptual (*i.e.*, receptive and expressive language, reading and
writing, money concepts, and self-direction); social (*i.e.*, interpersonal, responsibility, self-esteem,
gullibility, naivete, follows rules, obeys laws, and avoids victimization); and practical adaptive skills
(*i.e.*, personal activities of daily living such as eating, dressing, mobility and toileting; instrumental
activities of daily living such as preparing meals, taking medication, using the telephone, managing
money, using transportation, and doing housekeeping activities; maintaining a safe environment, and
occupational skills). *Manual of Diagnosis and Professional Practice in Mental
Retardation.*(American Association on Mental Retardation, 1993).

measurement used by the professional organizations, rather than "improvising his own definition for 'deficits in adaptive functioning.'" *Id.* at 942.

Three district court decisions after *Barnes* shed additional light on what an ALJ must do to properly assess a Social Security claimant's "deficits in adaptive functioning." In *Witt v. Barnhart*, 446 F.Supp. 2d 886, 894-95 (N.D. Ill. 2006), the court held that a formal diagnosis of mental retardation is not required to satisfy the diagnostic description set forth in the Listing 12.05 capsule. The court affirmed the ALJ's decision that the plaintiff did not satisfy the capsule definition of Listing 12.05 although the ALJ's decision was partly based upon the fact that the claimant had not been formally diagnosed with mental retardation. *Witt*, 446 F.Supp. 2d at 894. The ALJ's decision was upheld because the ALJ had properly assessed the plaintiff's "deficits in adaptive functioning" using the criteria set forth by the DSM-IV and substantial evidence supported his conclusion that the plaintiff failed to exhibit "deficits in adaptive functioning." *Id.* at 894-97. In *Bouton v. Astrue*, Civ. Action No. 07-4039, 2008 WL 627469 at *8-9 (D. Kas. Mar. 4, 2008) (slip op.)*,* the ALJ had not explicitly indicated which of the measurement methods he used in assessing the claimant's level of adaptive functioning as required by *Barnes.* The court, nevertheless, found the ALJ's assessment to be proper because he considered evidence that assessed the skill areas set forth in the DSM-IV approach for measuring a person's limitations in adaptive functioning and reached a justifiable conclusion. *Bouton*, 2008 WL 627469 at *8-9. Finally, in *Rodriguez v. Astrue*, Civ. Action No. 07-00906, 2008 WL 1957742 at *5-6 (D. Colo. May 2, 2008) (slip op.), the court reversed and remanded an appeal because the court found that the ALJ had considered only the claimant's work history in assessing "deficits in adaptive functioning" and did not consider any of the skills used to measure "deficits in adaptive functioning" as set forth by either the DSM-IV or any other standard. The Court

now turns to the decision of the ALJ in the instant matter.

It is not clear from the ALJ's opinion which organizational measure (if any) the ALJ used to assess whether Plaintiff had "deficits in adaptive functioning." Although the ALJ did note that Plaintiff's academic skills did not seem to indicate "deficits in adaptive functioning," the ALJ's opinion did not address Plaintiff's skills in the area of communication, self-direction, work, leisure, health, and safety or in the areas of conceptual, social, and practical skills, or any of the other criteria which are included in the standards of the AAMR or APA. Thus, the ALJ's assessment of Plaintiff's "deficits in adaptive functioning" does not seem to comply with the court's directive in *Barnes v. Barnhart* or the SSA's ruling set forth in *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 FR 20018 (April 24, 2002). This case, however, is saved from remand based upon the Court's findings as to the final argument between the parties pertaining to whether the ALJ properly concluded that Plaintiff did not meet the third criteria of Listing 12.05.

In order for Plaintiff's impairment to satisfy Listing 12.05C, she must meet all criteria of the listing. *See generally Sullivan v. Zebley*, 493 U.S. 521, 530, (1990) (noting that impairment manifesting only some of the criteria, no matter how severely, does not qualify); 20 C.F.R. § 404.1525(d) (noting that impairment must satisfy all criteria in a listing). Thus, if Plaintiff cannot satisfy the third criteria of 12.05C, *i.e.*, another mental impairment imposing an additional and significant work-related limitation of function, it is irrelevant whether the ALJ properly assessed whether Plaintiff has mental retardation, as exhibited by deficits in adaptive functioning. The Commissioner argues that substantial evidence supports the ALJ's finding that, even if Plaintiff has mental retardation, she did not have an additional mental impairment causing work-related limitations. (Docket No. 11 at 11). To the contrary, Plaintiff argues that her depressive disorder

clearly meets the significant other impairment standard set forth in 12.05C. (Docket No. 9 at 18).

Plaintiff contends that the records of Allegheny East, Plaintiff's mental health provider, establish a diagnosis of depressive disorder and record significantly low functioning as a result evidenced by a GAF score of 50.[5]  *Id.*  Plaintiff states that the ALJ attempted to minimize Plaintiff's depressive disorder and failed to give adequate consideration to Plaintiff's medical records when he assigned no weight to the GAF score of 50 reported in the Allegheny East MH/MR reports. *Id* at 19-20.  Plaintiff cites *VanHorn v. Schweiker*, 717 F.2d 871 (3d Cir. 1983) for the proposition that an ALJ may not capriciously set his opinion against that of physicians who present competent medical evidence. Plaintiff additionally directs the Court's attention to *Schaaf v. Matthews*, 574 F.2d 157 (3d Cir. 1978) and *Smith v. Califano*, 637 F.2d 968 (3d Cir. 1981) for the principle that where an ALJ does not give adequate consideration to unrebutted medical evidence, reversal is merited.

The Social Security regulations set forth the standard by which medical opinions are to be evaluated by an ALJ. *See* 20 C.F.R. § 404.1527(d). The ALJ must consider the examining relationship, the treatment relationship, the length of the treatment relationship, frequency of examination, and the nature and extend of the treatment relationship between the physician and patient. *Id.*; *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001). Based upon these considerations, the

---

[5]

"GAF" stands for 'Global Assessment of Functioning.' The protocol for GAF assessment is set forth in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Revised* (DSM-IVR). On a scale of 0-100, a mental health clinician or doctor assesses the overall effect of the patient's mental health disorder on their ability to function in activities of daily living, as well as socially and occupationally. A GAF of 50 describes "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job)." A GAF of 60 describes "moderate symptoms (*e.g.* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulties in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers)."

ALJ is permitted to weigh the evidence and assess the credibility of the relative sources of medical opinions. *Id.* Ultimately, it is the ALJ's responsibility to resolve conflicting medical evidence and provide specific reasons for doing so. *See Cotter,* 642 F.2d at 705. On appeal, this Court must not re-weigh evidence of record even if it is discredited by the ALJ; the Court's review is limited to determining if the ALJ's decisions are supported by substantial evidence. *See Monsour*, 806 F.2d at 1190.

In considering whether Plaintiff's depressive disorder satisfied Listing 12.05C, the ALJ noted that although Plaintiff had occasionally complained of depression in the past, Plaintiff stated that depression was a problem in the remote past and has since been resolved. (R. at 19-20). The ALJ noted that Plaintiff had not been on medication for any emotional disorder and that, with the exception of two consultative examinations in January 2006 and February 2006, Plaintiff saw no mental health practitioner from 2002 until June 2007 when she went to the Allegheny East Mental Health Center. *Id.* Although Plaintiff expressed to the Allegheny East clinician that she had "concerns of depressed mood, anger, and being a single mother" and stated that she was angry with her brother and with her ex-boyfriend, Plaintiff revealed no history of acting out inappropriately in response to her angry impulses. *Id.* Although Plaintiff indicated a remote history of suicidal ideation, she revealed no current ideations of suicide. *Id.* In fact, the ALJ found that she appeared highly motivated, her mental status examination demonstrated a normal mood and affect, and she expressed short-term goals of obtaining a driver's license, getting a job, completing job training, and obtaining SSI income. *Id.* Finally, the ALJ highlighted the fact that Plaintiff's intake examiner diagnosed her

with depressive disorder NOS.[6] (R. at 19-20). The examiner did not prescribe Plaintiff medication or refer Plaintiff for psychiatric evaluation, treatment, or hospitalization for any mental disorder, but advised Plaintiff to undergo weekly counseling sessions. *Id.* The ALJ stated that he gave no weight to the decision of Plaintiff's therapist to assign a GAF of 50 to the claimant at the time of intake and concluded that, based upon Plaintiff's wide range of activities, any depressive symptoms she may exhibit do not limit her ability to do basic work activities. *Id.*

Plaintiff is correct that an ALJ may not capriciously disregard competent medical evidence, however, an ALJ is permitted to discredit medical evidence that conflicts with other evidence in the record, provided that the ALJ provides his or her reasons for doing so. In this matter, the ALJ discredited the GAF score assigned to Plaintiff based upon his observation of Plaintiff's ability to perform a wide range of basic work activities. Plaintiff's argument would require the Court to re-weigh the evidence considered by the ALJ, however, the law is clear that this is not the job of district courts when reviewing Social Security decisions. *Monsour*, 806 F.2d at 1190. It is clear from the ALJ's opinion that he did, in fact, consider all evidence cited by Plaintiff, including medical records and Plaintiff's own testimony, but that he reached a decision unfavorable to Plaintiff. Thus, the ALJ's decision denying SSI benefits to Plaintiff is affirmed based upon the fact that substantial evidence supports the ALJ's conclusion that Plaintiff's depressive disorder did not satisfy the third requirement of Listing 12.05C.

## VIII. CONCLUSION

---

[6] [NOS, as used herein stands for not otherwise specified], meaning that Plaintiff did not meet the diagnostic criteria for a major depressive or mood disorder.

Based on the foregoing, Plaintiff's motion for summary judgment (Docket No. 8) is DENIED, and Defendant's motion for summary judgment (Docket No. 10) is GRANTED. Accordingly, the decision of the ALJ denying SSI benefits to Plaintiff is AFFIRMED. Appropriate order to follow.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Date:          September 16, 2008
cc/ecf:        All Counsel of Record